

SEALED

FILED

NOV 0 7 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

1   Phillip Benson, CA 97420
2   Warren - Benson Law Group
    620 Newport Center Drive, Suite 1100
3   Newport Beach, CA 92660
    949-721-6636
4   philbenson@warrenbensonlaw.com

5
    Jonathan Kroner, Fla. Bar 328677
6   300 S. Biscayne Blvd., Suite 3710
7   Miami, Florida 33131
    305 310 6046
8   jk@FloridaFalseClaim.com
9   *Pro hac vice admission to be applied for*

10  Attorneys for *Qui Tam* Plaintiff-Relator
    Steven Capeder
11

12              UNITED STATES DISTRICT COURT
13              EASTERN DISTRICT OF CALIFORNIA

14
15  **United States of America**          No. 2:18CV 2928 KJM KJN
    **and the State of California**
16  *ex rel.*                             **Complaint for Violation of the Federal and**
17  **Steven Capeder,**                   **California False Claims Acts, 31 U.S.C. §**
                    Plaintiffs,           **3729** *et seq.*, **Cal. Gov. Code § 12650** *et seq.*
18                                        **and Cal. Ins. Code § 1871.7**
19              v.
                                          Jury Trial Demanded
20  **Francis P. Lagattuta, MD,**
    **Lagz Corporation,**
21  **Spine and Pain Treatment Medical**
    **Center of Santa Barbara, Inc.,**    **Lodged under Seal** Pursuant to 31 U.S.C. §§
22  **LAGS Spine and Sportscare Medical**  3730(b)(2) and (3).
    **Centers, Inc.,**
23
24              Defendants.
25
26
27
28
                        1
                    Complaint

I.   Jurisdiction, Venue, and Parties ............................................................................3

II.  The False Claims Act, Medicare, and Medicaid ....................................................8

     A. False Claims Acts..............................................................................................8

     B. Medicare and Medicaid.....................................................................................9

     C. California Insurance Frauds Prevention Act....................................................13

III. Defendants' Fraudulent Conduct..........................................................................13

     A. EMG False Claims (CPTs 95886, 95910-95913).............................................13

          i.    EMG Overview and Claims Volume.................................................13

          ii.   Claims for Unnecessary EMG ..........................................................17

          iii.  Claims for EMGs Performed by Unqualifed Providers.....................19

     B. ENFD Frauds ("Punch") ................................................................................23

          i.    Non-Physicians Order Almost All Defendants' ENFDs. .................24

          ii.   Most ENFD Slides Were Not Read by a Proper Pathologist ...........25

          iii.  ENFD Kickbacks and Stark Law Violations .....................................26

     C. Opioid, and Evaluation and Management Issues.............................................27

IV.  Causes of Actions................................................................................................29

     A. Count I: Violations of 31 U.S.C. § 3729(a)(1)(A)....................................29

     B. Count II: Violations of 31 U.S.C. § 3729(a)(1)(B)....................................29

     C. Count III:  California False Claims Act Violations ..................................30

     D. Count IV California Insurance Frauds Prevention Act..............................31

2 Complaint

1.    Medicare and Medicaid pay for procedures that providers certify are medically necessary for their patients' health. Medical providers cannot certify this when patients are total strangers to them. For this reason, Medicare and Medicaid generally prohibit providers from falsely claiming under their names that they performed procedures when they did not perform the procedures.

2.    Dr. Lagattuta owns and operates approximately 27 clinics, five ambulatory surgical centers (ASCs), and a laboratory. In addition, the number of Medicare and Medicaid claims he submits to the U.S. Government suggests he is one of the nation's busiest physicians, personally performing tens of thousands of procedures for thousands of patients every year.

3.    Dr. Lagattuta's businesses generate many millions of dollars by performing a high volume of diagnostic procedures, referring many of these tests to his laboratory. But many of the procedures are unnecessary and, even more problematic, are claimed in the name of authorized providers despite being performed by physicians or technicians who are not authorized to diagnose, order, or perform the services.

4.    Qui tam Plaintiff-Relator Steve Capeder brings this Complaint pursuant to the Federal False Claims Act, 31 U.S.C. § 3730 *et seq*., and the California False Claims Act, California Government Code §§ 12650 *et seq*., and the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7.

## I.    Jurisdiction, Venue, and Parties

5.    This Court has jurisdiction under 31 U.S.C. § 3732 and 28 U.S.C. § 1345. Jurisdiction over the state law claims arises under 31 U.S.C. § 3732(b) (jurisdiction over

3 Complaint

1   state claims arising from the same transaction or occurrence as an action under the federal

2   FCA), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

3
4   6.      This Court has personal jurisdiction over Defendant Lagattuta and other

5   Defendants because they transact business and can be found in this district and

6   committed acts within this district that violate 31 U.S.C. § 3729.  31 U.S.C. § 3732(a).

7   7.      Upon information and belief, none of the jurisdictional bars in the FCA, 31 U.S.C.

8
9   § 3730(e) apply to this action.

10  8.      Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. §1391(b)

11  and (c) because one or more Defendants reside and/or transact business in this district and

12  have committed acts within this district that violate 31 U.S.C. § 3729. Section 3732(a)

13
14  further provides for nationwide service of process.

15  9.      Relator complied with all procedural requirements of 31 U.S.C. §3730(b)(2).

16  10.     California's FCA is patterned on the federal statutory scheme and the requirements

17  for state liability are the same as for federal liability. California Government Code §§

18
19  12650 *et seq.*

20  11.     From June 27, 2016 to the present, **Plaintiff Relator Steven Capeder** worked for

21  Defendant Lagz Corp. During the summer of 2018, he was promoted to "Operations

22  Director" of Ambulatory Surgical Centers, and then demoted within a week of taking

23
24  issue with Dr. Lagattuta and senior management over the fact that surgical center

25  documents were being falsified which could endanger patient safety.

26  12.     With respect to each allegation herein made upon information and belief, Mr.

27  Capeder has, based upon his knowledge, experience, and supporting data, a reasoned

28

4 Complaint

factual basis to make the allegations but lacks complete details of it. While Mr. Capeder

has significant evidence of the fraud alleged herein (the details of which follow), much of

the documentary evidence necessary to prove the allegations in this Complaint is in the

possession of the Defendants, the United States, or California.

13.     Before his work with Defendants, and until approximately 2008, he worked as a

real estate investor, developer, and builder.

14.     **Defendant Francis P. Lagattuta**, M.D. ("Lagattuta"), NPI 1992799704, practices

medicine in this district.

15.     In 2016, Medicare Part B paid Dr. Lagatutta $2,159,638 for more than 24,000

claimed procedures, more than half of which, $1,368,754, was for the following:

| code and partial description | line srvc cnt | amt paid | Natl rank by amt paid |
|---|---|---|---|
| 88314, Stained specimen slides... | 4,512 | 293,221 | 1 |
| 88356, Microscopic genetic analysis | 2,289 | 389,594 | 3 |
| 95911, Nerve trans. studies, 9-10 | 549 | 104,794 | 3 |
| J0171, Inj. adrenalin, epinephrine, 0.1 mg | 243 | 26 | 4 |
| 88344, Stained specimen slides... | 2,267 | 331,390 | 5 |
| 95886, Needle measure. elec. Activity | 1,418 | 108,111 | 10 |
| 88305, Pathology xm, tissue | 2,310 | 141,618 | n/a |

16.     In addition, the 2016 Part B payment of $2,159,638 included $531,520 for 6,857

CPT G0479 drug tests *for 2,907 unique patients*.

17.     Additionally, Dr. Lagatutta also claimed millions of dollars billed to other payors

including Medi-Cal and private insurance.

18.     In addition to practicing medicine, Defendant Lagattuta manages the other Defendant entities and, on information and belief, Defendant Lagattuta owns and controls all other Defendants in this case.

19.     Defendant **Lagz Corporation** is a Nevada Corporation with California corporate number C2475799, which does business in California at 135 Carmen Ln., Santa Maria, CA, 93454, and whose agent for service of process is Dr. Lagattuta.

20.     Defendant Lagz, provides administrative services for Dr. Lagattuta and his other entities.

21.     **Defendant Spine and Pain Treatment Medical Center of Santa Barbara Inc.,** NPI 1740520667, is based in Santa Maria, in Santa Barbara County, California, and does business as:

- LAGS Surgery Center Fresno,
- LAGS Surgery Center Oxnard
- LAGS Surgery Center Bakersfield.
- LAGS Surgery Center Santa Barbara

22.     Defendant **Lags Spine and Sportscare Medical Centers, Inc.,** NPI 1447244256, an entity used for Dr. Lagattuta's clinics, is based in Santa Maria, in Santa Barbara County California, d/b/a Joint and Pain Treatment Centers, CCN-05C0002126.

23.     In 2018, through September, Defendants' average monthly gross billings exceeded eight million ($8,000,000), of which monthly Medicare billings averaged $1.6 million and Medicare facility billings averaged $273,000.

6 Complaint

24.  Entities not named as Defendants but which may be involved include:

- Lags Spine and Sportscare Central Coast Medical, Inc., 135 Carmen Ln., Santa Maria, CA, and whose agent for service of process is Dr. Lagattuta, at the same address,
- Spine and Pain Treatment Medical Center of Santa Maria, Inc., 135 Carmen Ln., Santa Maria, CA, whose agent for service is Dr. Lagattuta,
- Lagattuta Land LLC (owns real estate), and
- LAGS 50, LLC (owns real estate, usually as 50% owner).

25.  Dr. Lagattuta's entities conduct business under these and other fictitious names:

- LAGS Medical Center of Modesto CA,
- LAGS Medical Centers of Hayward CA,
- LAGS Medical Centers of Portland Oregon,
- Spine and Pain Treatment Center of Santa Maria CA,
- Spine and Pain Treatment Center of Fresno CA,
- Spine and Pain Treatment Center of Bakersfield CA, and
- Spine and Pain Treatment Center of Santa Barbara CA.

26.  Dr. Lagattuta's entities conduct business at these locations:

- 3550 Q Street, Suites 103, 105, 201, and 202 Bakersfield, CA 93301
- 5771 N. Fresno St., Ste. 101, Fresno, CA 93710
- 349 E. Bullard Ave., Ste. 105, Fresno, CA 93710
- 3751 and 3755 E. Shields Ave., Fresno, CA 93726
- 592 South 13th St., Grover Beach, CA 93433
- 24700 Calaroga Ave., Suite 103, Hayward, CA 94545
- 450 West D St., Lemoore, CA 93245
- 218 North I St., Lompoc, CA 94336
- 803 Coffee Rd., Ste. 11, Modesto CA 95355
- 1317 Oakdale Rd., Suite 800, Modesto CA 95355
- 2651 S. C St., Ste. 200, Oxnard CA 93033
- 2362 N Oxnard Blvd. Ste. 102, Oxnard, CA 93036

7 Complaint

- 7275 E. Southgate Dr., Suite 306, Sacramento, CA 95823
- 945 Blanco Circle, Ste. A, Salinas, CA 93901
- 1223 Higuera St., Suite 101, San Luis Obispo, CA 93401
- 1110 Coast Village Cir., Santa Barbara, CA 93108
- 135 Carmen Ln., Santa Maria, CA 93458
- 801 E. Chapel St., Suites 1 and 2, Santa Maria, CA 93454
- 201 N College Dr. Ste. 101, Santa Maria, CA 93454
- 4505 Precissi Lane, Ste. A, Stockton, CA 95207
- 1050 Las Tablas Rd., Ste. 16, Templeton, CA 93465
- 390 Lombard Street, Thousand Oaks, CA 91360
- 4080 Loma Vista Rd., Ste. F, Ventura, CA 93003
- 2350 W. Whitendale Ave., Visalia, CA 93277
- 510 West 25th St., Merced CA 95340

Oregon

- 17175 SW Tualatin Valley Hwy, Suite A, Beaverton, OR 97006
- 169 NE 102nd Ave., Portland, OR 97220

## II.    The False Claims Act, Medicare, and Medicaid

### A.    False Claims Acts

27.    The Federal False Claims Act is the federal government's primary tool to recover losses due to fraud and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong. 2d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N. 5266.

28.    The Act prohibits the submission of false or fraudulent claims and false statements to obtain or keep federal money. 31 U.S.C. § 3729(a)(1).

29.    Under the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the civil penalties were adjusted from $ 5,500 to $ 11,000 for violations occurring on or after September 29,

1    1999. For violations that occurred after November 1, 2015, Department of Justice (DOJ)

2    announced increased penalties to between $10,781 and $21,562 per fraudulent claim.

3
4    30.    California patterned the California False Claims Act, California Government Code

5    §§ 12650 *et seq.* ("CFCA"), on the federal statutory scheme.

6    31.    The requirements for state liability are substantially the same as for federal

7    liability. *See* Cal. Govt. Code § 12651(a)(1-3, 7).

8
9    32.    Defendants agreed to comply with California's Welfare and Institutions Code

10   pursuant to its Medi-Cal provider agreement.

11   33.    The terms "knowing" and "knowingly" "mean that a person, with respect to

12   information (1) has actual knowledge of the information; (2) acts in deliberate ignorance

13
14   of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or

15   falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to

16   defraud is required. 31 U.S.C. § 3729(b)(1)(B). *See* Cal. Govt. Code § 12650(b).

17                        **B.    Medicare and Medicaid**

18
19   34.    Medicare is a third- party reimbursement program that underwrites medical

20   expenses of the elderly and the disabled. 42 U.S.C.§§ 1395 et seq. The Medicare claims

21   in this case arise under Medicare Part B which generally covers physician services,

22   including medical and surgical treatment and outpatient treatment and diagnosis. Part B,

23
24   42 U.S.C. §§ 1395j *et seq.*; 1395l (payment of benefits).

25   35.    Medicaid is a medical assistance program for indigent and other needy people that

26   is financed by joint federal and state funding and is administered by the states according

27   to federal regulations, oversight, and enforcement. 42 U.S.C. §§ 1396 *et seq.* Each state

28
                              9 Complaint

implements its version of Medicaid, such as California's Medi-Cal, according to a State Plan approved by HHS. Within broad federal regulatory and policy guidelines (*see* 42 C.F.R. § 430 *et seq.*, and CMS publications), the states determine who is Medicaid-eligible, what services are covered, and how much to reimburse healthcare providers. The states, through intermediaries, also receive healthcare provider claims for program reimbursements, evaluate those claims, make payments to healthcare providers, and present the claims to HHS/CMS for reimbursement of the federal government's share.

36.     These government programs do not pay for every medical service that a doctor may prescribe, recommend, or perform. Although providers can receive reimbursement for their services, the programs only reimburse for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A).

37.     CMS has final authority over what services are "reasonable and necessary" and makes such determinations in several ways. First, CMS can make a "national coverage determination," which determines "whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395y(l)(6)(A). Second, the administrative contractors responsible for reviewing Medicare claims can make "local coverage determination[s]," which determine whether a treatment is covered for claims within that contractor's responsibility. *Id.* §§ 1395y(l)(6)(B), 1395ff(f)(2)(B). Third, contractors can make determinations on a claim-by-claim basis. *See id.* § 1395ff(a)(1)(A). Further, CMS consults "the advice of medical consultants," the "accepted standards of medical

practice," and, when applicable, the "medical circumstances of the individual case."

CMS, Medicare Benefit Policy Manual, Ch. 15 § 50.4.3 (2016).

38.     Physicians must enroll in the Medicare program to be eligible to receive Medicare payment for covered services provided to Medicare beneficiaries. 42 C.F.R. § 424.505.

39.     Physicians and other qualified medical providers play a key role in enforcing the "reasonable and necessary" requirement by certifying that the services provided were "medically necessary" and "medically indicated and necessary to the health of the patient." 42 C.F.R. § 424.10(a), *see also* 42 U.S.C. § 1395f(a)(2)-(3) (Part A); *id.* § 1395n(a)(2) (Part B). Typically, this certification occurs on CMS Form, 1500 Health Insurance Claim Form, or its electronic equivalent. 42 C.F.R. § 424.32 (Basic requirements for all claims). The form requires the physician to certify that the services provided were "medically necessary" and "medically indicated and necessary to the health of the patient."

40.     If the physician certifies the necessity of the procedure, then the claim will likely to be paid because Medicare claims processing is largely an automated process.

41.     At all times relevant to this action, Defendants submitted, or caused to be submitted, the electronic equivalent of Form 1500 to CMS and California for reimbursement for services.

42.     Form 1500 requires the submitting healthcare provider to include various fields of information prior to reimbursement, including: the date(s) of service; a code for the service(s) provided known as a "Current Procedural Terminology Code" or "CPT Code");

and the rendering healthcare provider's national identification number ("National Provider Identifier" or "NPI") and signature.

43.     According to Form 1500's instructions, a provider's signature certifies "that services shown on [the Form 1500] were medically indicated and necessary for the health of the patient and were personally furnished by [the provider] or were furnished incident to [his/her] professional service by [his/her] employee under [his/her] immediate personal supervision."

44.     Providers, such as Defendants, submit or cause the submission of claims to Medicare by transmitting them to a private carrier or a Medicare Administrative Contractor ("MAC"), which processes the claims on behalf of HHS/CMS.

45.     All healthcare providers that submit claims electronically to CMS or to CMS MACs, must certify in their application that they "will submit claims that are accurate, complete, and truthful," and must acknowledge that "all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim that is required pursuant to this agreement may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." *See* Medicare Claims Processing Manual, § 30.2.A.

46.     Similar rules apply to Medicaid healthcare providers.

47.     Medicare and Medicaid rules and policies require healthcare providers to contemporaneously create and maintain accurate medical records to support the providers' claims for reimbursement. *See e.g.*, CMS MLN Matters Number: SE1022

("Providers/suppliers should maintain a medical record for each Medicare beneficiary that is their patient. Remember that medical records must be accurately written, promptly completed, accessible, properly filed and retained.")

### C. California Insurance Frauds Prevention Act

48. California provides for a civil *qui tam* action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud. Cal. Ins. Code § 1871.7(e). This *qui tam* provision is patterned after the Federal False Claims Act, 31 U.S.C. §§ 3729-32, and the California False Claims Act, Cal. Gov't Code §§ 12650 et seq.

49. Subsection (b) of Cal. Ins. Code § 1871.7 provides for civil recoveries against persons who violate the provisions of Penal Code §§ 549 or 550.

### III. Defendants' Fraudulent Conduct

### A. EMG False Claims (CPTs 95886, 95910-95913)

#### i. EMG Overview and Claims Volume

50. The American Association of Neuromuscular and Electrodiagnostic Medicine (AANEM) defines electrodiagnostic medicine and needle electromyography (EMG):

> The electrodiagnostic medicine (EDX) evaluation serves to evaluate patients with disorders of the peripheral and/or central nervous system, and other neuromuscular (NM) disorders.

51.    The American Association of Neuromuscular & Electrodiagnostic Medicine

(AANEM) Position Statement on Electrodiagnostic Medicine was last updated on

8/20/14[1]. [Hereinafter, "AANEM Position Statement"].

52.    AANEM's position is that nonphysician providers lack the appropriate training and

knowledge to perform and interpret EMG studies.

> EDX studies are performed by physicians, almost exclusively neurologist and
> physiatrists, as part of an EDX evaluation. *The AANEM believes that*
> *nonphysician providers, including physical therapists, chiropractors,*
> *physician assistants, and others, lack the appropriate training and knowledge*
> *to perform and interpret EMG studies and interpret NCSs.* The AANEM
> believes that these providers, along with END technologists, may perform
> NCS *with direct physician supervision.* EDX evaluations include history-
> taking, appropriate physical examination, and the design, performance, and
> interpretation of EDX studies. *These evaluations usually take a minimum of*
> *30 minutes to perform and can take up to 2 hours* or more in particularly
> complicated clinical situations.

AANEM Position Statement [emphasis supplied]


53.    An excerpt from AANEM's position on nerve conduction studies claimed by

Defendants, including CPT 95910 – 95913, generally describe these tests and states that

the number of nerves tested should be the *minimum* necessary to address clinical issues.

> *CPT Codes 95907-95913: Nerve Conduction Studies Overview*
> 1. NCSs (CPT codes 95907-95913) are performed to assess the integrity and
> diagnose diseases of the peripheral nervous system. Specifically, they assess
> the speed (conduction velocity, and/or latency), size (amplitude), and shape
> of the response. Pathological findings include conduction slowing,
> conduction block, no response, and/or low amplitude response. …
> 6. The number of nerves tested should be the minimum necessary to address
> the clinical issue. *In almost all studies, this will appropriately include*

---

[1]    https://www.aanem.org/getmedia/c50e666e-c04b-46bc-9156-6f1f986db5e1/PositionStatement-
Overview_of_EDX_Med.pdf.aspx

*evaluation of 1 or more nerves that have normal test results.*
AANEM Position Statement [emphasis supplied]

54.     Mr. Capeder has observed the way Defendants conduct EMGs, including observing Dr. Lagattuta. Typically, Dr. Lagattuta is in the room with a patient for about five minutes, and the rest of the EMG is done by an EMG tech. Dr. Lagattuta and other doctors see other patients and do other procedures while the EMG tech does most of the work. The doctors then return for a few minutes for the "needle part." As soon as that is done, the doctors quickly leave to see other patients and perform other procedures.

55.     The doctors can do 16 – 18 EMGs a day this way, while seeing a full schedule of other patients and performing other procedures.

56.     Defendants claim or cause claims for Nerve Conduction Studies, CPT codes 95910-95913[2]:

> *Nerve conduction studies*
>             95910:  seven to eight studies
>             95911:  nine to ten studies
>             95912:  eleven to twelve studies
>             95913:  thirteen or more studies

57.     In 2018, Defendants averaged more than 900 EMG claims per month. This includes Medicare, Medicaid, and private insurance patient procedures.

58.     In 2016 Medicare part B for CPT code 95911, Dr. Lagattuta was the third highest claimant in the country, receiving $104,794 for 549 procedures on 546 beneficiaries.

59.     On information and belief, Dr. Lagatutta made similar claims for CPT codes 95910-95913 to other payors including the state of California and private insurers.

---

[2]   Defendants file no Medicare part B claims for CPT codes 95907-95909, nerve conduction studies; 95907: one-two studies; 95908: three-four studies; or 95909: five-six studies.

15 Complaint

60.    The abbreviated descriptions for CPT Code 95886 is "Needle EMG, Complete, Each Extremity, When Done With Nerve Conduction Studies."

61.    For Medicare part B in 2016 CPT 95886, Dr. Lagattuta was the tenth highest claimant in the country, receiving $108,111 for 1,418 procedures on 709 distinct patients.

62.    On information and belief, Dr. Lagattuta makes or causes similar claims for CPT codes 95886 to other providers, including the state of California and private insurers.

63.    Dr. Lagattuta's Medicare part B claims differ from other providers' claims not just in overall volume, but in the number of studies per patient. Nationally, 52% of the claims are for 1-8 studies (CPTs 95907 – 95910), and 48% are for nine or more studies (CPTs 95911 - 95913). But only 2% of Dr. Lagattuta's claims are for fewer than nine studies, and the remaining 98% are for nine or more studies.

| Codes, # of studies | Lagattuta | | National |
|---|---|---|---|
| 95907-10,  1-8 studies | 14 | 2% | 52% |
| 95911-13,  9 or more | 721 | 98% | 48% |

64.    The reasons for this are reflected in the reimbursement rates. The table below shows national rates for Medicare part B in 2016.

| Code, # of studies | Lagattuta | | National | | Avg. $ |
|---|---|---|---|---|---|
| 95907, 1-2 studies | 0 | 0% | 4,692 | 1% | $  58 |
| 95908,  3-4 studies | 0 | 0% | 50,942 | 8% | 77 |
| 95909, 5-6 studies | 0 | 0% | 119,556 | 20% | 98 |
| 95910, 7-8 studies | 14 | 2% | 141,980 | 23% | 135 |
| 95911, 9-10 studies | 549 | 75% | 149,376 | 25% | 169 |
| 95912, 11-12 studies | 11 | 1% | 64,754 | 11% | 192 |
| 95913, 13 or more studies | 161 | 22% | 74,674 | 12% | 223 |
| Total | 735 | 100% | 605,974 | 100% | |

65.    Dr. Lagattuta does not turn away patients who might require fewer than nine studies. Rather, his practices differ from other providers' accepted standards of medical practice because he files or causes claims for nine or more studies even when patients require fewer than nine studies, without regard to whether they are "medically indicated and necessary to the health of the patient."

66.    In 2016, Medicare reimbursed Dr. Lagattuta on average at rates even higher than the national average, as shown above. For example, he averaged $244 for CPT 95913, compared to national average of $223.

67.    Medicare covers diagnostics such as ENFDs to help diagnose or rule out suspected problems or conditions. But relative to the number of these and other diagnostics, Defendants treat very few problems. When so many of the ENFDs turn out normal/negative, it further supports that many were unnecessary in the first place.

ii.    **Claims for Unnecessary EMG**

68.    Defendants' claim or cause claims for EMGs which are not medically necessary and reasonable.

69.    LAGS has "MAP Protocols" which are used not only to assess each patient's Metabolic, Anatomic, and Psychological status but also to trigger orders for EMG and ENFD tests. The metabolic assessment directs the ordering of EMG and ENFD tests if a patient answers yes to any neuropathy questions:

> If the patient answered "YES" to ANY of the Neuropathy questions, order a "Nerve Study" which includes Electromyography (EMG), and depending on those results, an Epidermal Nerve Fiber Density (ENFD) test, and Qsweat may also be ordered.

70. LAGS has six neuropathy questions:

   1. Do you have difficulty sleeping because of feet and leg pain?
   2. Do you have skin dryness in the upper or lower extremities?
   3. Do you have dizziness when standing up?
   4. Do you have loss of balance and coordination; difficulty walking or moving your arms?
   5. Do you have abnormalities in the blood pressure or pulse; or unusual sweating?
   6. Do you have persistent stomach problems not associated with another diagnosis?
   7. If yes to any of the above 7 question, has a Nerve Conduction been completed in the last year?

71. These questions are in the EMR system. When a new patient has a first visit, the medical assistant asks them the questions. Question 7 screens patients for whom a repeat study would not be reimbursable.

72. Many patients are designated "YES" because many patients are over-weight, and thus likely to have high blood pressure (question five)

73. On information and belief, non-medical clerical employees, who work under Karina Mendez order ENFDs (internally referenced as "punches") and EMGs, schedule the patients, and call the various clinic managers and tell them to call the patients and tell them they have to come in for a scheduled appointment.

74. Most, but not all, medical providers perform services ordered by the clericals. For example, Olivia Seibenick, PA, told Mr. Capeder that when a patient should not be getting a punch (ENFD) she tells her clinic manager Sandra Pulido that the patient is not a candidate, explains why, and that she will not do a punch. But when Ms. Seibenick believes a patient needs a punch, she orders it herself under her credentials.

75.    Mr. Capeder is aware that Sandra Pulido, manager of the Lompoc and Santa Barbara clinics, complains about this because when her office calls the patients, many state that their doctor never told them they needed an EMG, never ordered an EMG, and want to know why they need to come in.

### iii.    Claims for EMGs Performed by Unqualifed Providers

76.    Dr. Lagattuta routinely files claims in his name for EMGs performed by other providers, and routinely directs the filing of claims in the names of providers who did not perform the actual services. This happens when the other providers are not certified by the insurance company, or when the other providers lack credentials to perform the services.

77.    With rare exceptions, 42 C.F.R. 410.32(a) requires the treating physician to order tests.

> (a) Ordering diagnostic tests. All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary (see §411.15(k)(1) of this chapter).

78.    Only under specific circumstances, may these diagnostic tests performed under physician supervision be considered reasonable and necessary. 42 C.F.R. § 410.32(b).

> Nerve conduction codes 95907-95913 had their Physician Supervision of Diagnostic Procedures Indicators adjusted to 7A effective 01/01/2013 (CR 8169). Therefore if authorized by state law Physical Therapists are allowed the technical portion and professional component of the test according to the description of 7A which is included in the Billing and Coding Guideline attached.

19 Complaint

http://www.radiologybillingcoding.com/2017/02/cpt-95886-95911-95913-95910-95885-nerve.html

> The TC components of the following Nerve Conduction Test: 95907, 95908, 95909, 95910, 95911, 95912, and 95913, are having their Physician Supervision Of Diagnostic Procedures Indicators adjusted to "7A" = "Supervision standards for level 77 apply; in addition, the PT with ABPTS certification may personally supervise another PT, but only the PT with ABPTS certification may bill." ("77" = "Procedure must be performed by a PT with ABPTS certification (TC & PC) or by a PT without certification under general supervision of a physician (TC only; PC always physician)"). These changes are effective January 1, 2013.

Pub 100-04 Medicare Claims Processing, Attachment - (Pub. 100-04) Change Request 8169 April 1, 2013, https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R2677CP.pdf at 9.

79.   Mr. Capeder estimates these fraudulent EMGs could result in claims of millions of dollars per year submitted to Medicare, Medicaid, and private insurance companies.

80.   For example, Mr. Capeder believes Dr. Lagattuta signs and claims under his name *all* of Dr. Mahendra Nath's and Dr. Bulbas's EMGs. Mr. Capeder understands this was because Dr. Nath's past disciplinary issues made it difficult to get him credentialed with the insurance companies.

81.   Realtor believes that many of Dr. Matthew Hadilaksono's EMGs were also being signed by Dr. Lagattuta when he first started and was not yet credentialed with the insurance companies.

82.   As noted above, credentialing may have posed challenges because Mahendra Nath, M.D., NPI #1477501484, CA License #A032279, has no known hospital affiliations and

has been repeatedly disciplined by the State of California.[3] California records show he graduated medical school in 1964.

83. Lastly, Lags Medical Centers also has a contract with "One Call," a third-party company that deals with workers compensation cases, and performs EMGs on One Call's patients. Mr. Capeder's understanding is that for a long time many of Defendants' doctors were not approved through One Call. As a result, many of those EMGs were likely billed under Dr. Lagattura but performed by other doctors.

84. On March 19, 2018, Mr. Capeder learned from Geron Tucker, that Dr. Nath does EMGs under Dr. Lagattuta's schedule in Visalia.

85. Mr. Capeder learned from Karina Mendez that a PA named Hung Ngo at the Visalia facility, was only credentialed with Medicare and LaSalle Insurance, so in the Visalia clinic they "schedule" the patients with Dr. Lagattuta in the EMR system to make it appear he saw these patients for billing purposes. However, Dr. Lagattuta did not see the patients. Hung Ngo and possibly others saw the patients.

86. Dr. Winston Montero, license A 122675, NPI 1851550404, practices medicine in Santa Maria California and performs procedures for one or more Defendants. On information and belief, Dr. Montero does not sign the abnormal EMGs, but only signs the normal ones, and Dr. Lagattuta signs the abnormal ones. Mr. Capeder's understanding is that this is because only Dr. Lagattuta is EMG certified, and abnormal EMGs have to be signed off by a doctor who is EMG certified.

---

[3] Disciplinary documents here:
https://search.dca.ca.gov/details/8002/A/32279/d8837e3bc48dac9eed56bf34ee6e42f6

21 Complaint

87.     On February 16, 2018, Mr. Capeder noted that during a 7 a.m. call, Dr. Lagattuta

instructed that in Portland, Oregon most of Dr. Brianna Hoffman's appointments should

be put under either his schedule or the schedule of a mid-level named Mila Sklyarenko

because Dr. Hoffman was not credentialed by the insurance companies. During that call,

Matt Mosetick, CFO, who also owns his own billing company, asked about Dr. Brianna

Hoffman in Portland. Matt Mosetick said Dr. Brianna Hoffman was only working a few

days a week and asked if there was something else she could do like marketing since they

were paying her for five days. Dr. Lagattuta said [paraphrasing]:

> Matt, I hate to say it but you're wrong. She does blocks one day a week under
> ____ and EMGs two days a week under me. She's a total *phantom*. You could
> not find it because our plan is working. We set it up so good, that Matt can't
> even find it. Don't tell Maria Doherty [Director of Revenue Management].
> She's a total *phantom*" [4]

88.     Dr. Lagattuta repeated the term "phantom," meaning somebody who performs

services but who does not appear on EMR records as filing claims.

89.     On May 11, 2018, at a Lags Providers meeting in Santa Maria, Mr. Capeder spoke

with physician assistants Andy Hoosier, PA, and Olivia Seibenick, PA, and told them that

Kern Family Health, the biggest payer (mostly Medicaid) in the Bakersfield clinic,

requires mid-level and physician providers to have a full year of pain experience before

they can see patients.[5] Michael "Andy" Hoosier discussed that during his first year he

saw patients who were "scheduled" under Dr. Lagattuta's license to make it appear as

---

[4]     Maria Vasquez was former name of Maria Doherty, Director of Revenue Management,
sometimes referred to as Maria D.
[5]     Hoosier, Michael Andrew, physicians asst., license 53758; Seibenick, Olivia A,
physician's asst., license 52214

22 Complaint

though Dr. Lagattuta was the one who saw the patients— even though Dr. Lagattuta did not see most of the patients in the Bakersfield clinic.

90.     On May 21, 2018, Dr. Lagattuta talked about all the new providers coming on board. He said there was a credentialing issue but they could see all the patients under him until the providers were "credentialed," meaning they could be shown on the EMR "schedule" under his name and so claims could be filed with insurance companies.

91.     Jennifer McGrew, Director of Nursing, told Mr. Capeder that medical assistants often diagnose and prescribe for Dr. Lagattuta.

92.     When patients return for their pain medication – including opioids –they are often scheduled for unnecessary procedures.

### B.     ENFD Frauds ("Punch")

93.     Defendants and especially Dr. Lagattuta claim a very high volume of ENFD (Epidermal Nerve Fiber Density) procedures. Internally these are referred to as "punch." These include:

- 88305   Pathology examination of tissue using a microscope, intermediate complexity
- 88314   Special stained specimen slides to examine tissue and frozen preparation of specimen including interpretation and report
- 88344   Special stained specimen slides to examine tissue
- 88356   Microscopic genetic analysis of nerve tissue

94.     In 2018, Defendants averaged more than 600 ENFD claims per month. This includes Medicare, Medicaid, and private insurance.

95.     Dr. Lagattuta's 2016 Medicare part B claims made him one of the highest ENFD claimants in the country:

|  | Code. | claims | patients | Services / pt. | amt paid | National rank |
|---|---|---|---|---|---|---|
|  | 88305 | 2,310 | 779 | 3.0 | $ 141,618 |  |
|  | 88314 | 4,512 | 776 | 5.8 | 293,221 | 1 |
|  | 88344 | 2,267 | 775 | 2.9 | 331,390 | 5 |
|  | 88356 | 2,289 | 780 | 2.9 | 389,594 | 3 |

96.    For CPT 88314, not only is he an outlier in his 4,512 claimed procedures, but also claiming  multiple (3) procedures per patient. [6]



Procedures vs Beneficiaries, Code 88314
2016 data

Red dot shows NPI 1992796704
Special stained specimen slides to examine tissue and frozen preparation of specimen including interpretation and report
Provider in question earned $293,221 for this code

97.    In addition to Medicare clams above, Defendants claim many of these procedures for Medicaid claims processed through insurance companies.

    **i.    Non-Physicians Order Almost All Defendants' ENFDs.**

98.    Defendants file false claims for many ENFD ("Epidermal Nerve Fiber Density") tests. Although CMS Guidelines require that the test be ordered by a physician, they are

---

[6]   The other outlier to the far right, Therapath Neuropathology, shows twice as many patients, and far fewer procedures. Also, its business model and medical staff shows it is in no way comparable to Defendants. https://www.therapath.com/about-us/medical-team/

typically ordered by clericals and paraprofessionals in Fresno who sign on to the EMR system under doctors' names and order the tests as if they were the doctors.

99.    Intially, Crystal Travis in Santa Maria was ordering the ENFDs. At some point, Dr. Lagattuta directed payment of an "incentive bonus" during the time when Crystal Travis was ordering them. When they stopped paying the bonus, punches fell. Later, Karina Mendez started ordering the ENFDs, and then a team of non-medical clerical she trained on how to order ENFDs started ordering them. Ms. Mendez had been manager of all clinics until she was demoted. Now she manages the Fresno clinics, although her email still shows "Regional Manager."

100.   In early 2018, Dr. Lagattuta directed Karina Mendez to begin ordering ENFD tests under mid-level physicians' names in order to protect him because the claim volume appeared too high. Mr. Capeder believes that, for the most part, these tests are still being claimed under Dr. Lagattuta because other providers did not accept having others order tests using their credentials.

**ii.    Most ENFD Slides Were Not Read by a Proper Pathologist**

101.   One or more Defendants own and operate what is known as the Lags Medical Centers ENFD Laboratory at 801 E. Chapel St., Suite six, Santa Maria, CA 93458.

102.   The laboratory director was Anwar Molani, MD, FASCP CLIA Number: 05D1058036, and his name was retained for many months after he stopped working for Defendants because he was credentialed to run the lab.

103.   Around May of 2018, Dr. Lagattuta hired Dr. Carl Johnson, pathologist, NPI 1487679684, license A33572 as director of the lab. Mr. Capeder learned from Dr.

Lagattuta that he paid Dr. Johnson approximately $20,000 per month for what Dr. Lagattuta called an "insurance policy." Dr. Lagattuta sought to ensure he had the name of a properly credentialed physician to read ENFD slides, approximately $500,000 per month billing. However, Mr. Capeder's understanding is that most, if not all, of the slides are read by Leo Deguzman, a lab tech who is not even certified as a "histo-tech," the minimum qualification necessary to read ENFD slides.

104.   Mr. Capeder estimates the 2017 fraudulent billing for improperly reviewed slides at about $6.3 million. Mr. Capeder estimates that from January 1, 2016 through January 13, 2018, Medicare was billed for 9,126 of these tests for approximately $13 million.

105.   On information and belief, the wife of a friend of Dr. Lagattuta's had read thousands of slides in her home, emailed Dr. Lagattuta her findings, and he would sign them. She was not a licensed histo-tech and essentially the only one reading the slides. Later, a LAGS employee, who was also not a histo-tech, read thousands of slides after the ex-friend's wife stopped reading them due to the couple's falling out with Dr. Lagattuta.

106.   As of September 2018, the CLIA license is still in former employee Dr. Molani's name.[7]

iii.   **ENFD Kickbacks and Stark Law Violations**

107.   From late 2014 or early 2015 until about May 1, 2017, Dr. Lagattuta paid productivity bonuses to physician employees of up to $100 per ENFD procedure. The bonus was calculated using CPT code 11100, which is the first actual biopsy portion of

_____

[7]   https://www.cms.gov/Regulations-and-Guidance/Legislation/CLIA/index.html?redirect=/CLIA

the procedure that is billed by the clinic. Usually 2 – 3 biopsies are done each time, but #2 – 3 get billed as 11101. By basing the bonus on code 11100, this indicated the number of ENFDs (referred to internally as "labs") that were sent to Dr. Lagattuta's laboratory.

108.   On or about May 1, 2017, Dr. Lagattuta eliminated the bonuses and replaced them with raises because bonuses became too high and too conspicuous.

109.   Dr. Lagattuta and his wholly owned entities referred these tests to Dr. Lagattuta's laboratory. This is an improper financial relationship under the Stark Act.

### C.   Opioid, and Evaluation and Management Issues

110.   Dr. Lagattuta directs non-providers to access providers' tokens, and allows medical assistants to order scripts in providers' names. Some providers refuse to allow this, including Dr. Brown-Walter, Olivia Seibenick PA, Elbow Winchell, PA, and Beth Brown PA.

111.   On information and belief, California requires that for mid-level providers with DEA certification to prescribe opioids, a supervising physician must review 10% of mid-levels' charts. But Dr. Lagattuta sends charts to Colombia (South America, not California) and pays cash to contractors there for chart review.

112.   These practices make many laboratory claims false. 42 U.S.C. § 263a(d)(ii)(III) (relating to personnel qualifications), and 42 C.F.R. §493.49 -.53. *See generally* Clinical Laboratory Improvement Amendments, 42 U.S.C. § 263a and Standards and Certification: Laboratory Requirements, 42 C.F.R. §493.

113.   Relator does not know whether the Columbians or domestic employees log in with providers' credentials to show that the charts are reviewed.

27 Complaint

114.   Medicare pays for physicians' and for specific non-physician practitioners' medically necessary evaluation and management (E/M) services. Medicare Claims Processing Manual, Publication 100-04, Ch.12, §30.6.1.

115.   Code 99204, for new patients, requires a comprehensive history; a comprehensive examination; and medical decision making of moderate complexity. Code 99214, for established patients, requires at least two of these three key components:

- a detailed history;
- a detailed examination;
- medical decision making of moderate complexity.

116.   It is not medically necessary to perform and then bill for a higher level of evaluation and management service when professional knowledge and experience dictates a lower level of service. Manual at Ch. § 30.6.1.A.

117.   In 2016, Dr. Lagattuta claimed many E/M services under Medicare part B.

| code | Count | Patients | Amt paid |
|------|-------|----------|----------|
| 99201 | 0 | 0 | $      0 |
| 99202 | 0 | 0 | 0 |
| 99203 | 0 | 0 | 0 |
| 99204 | 213 | 210 | 26,234 |
| 99205 | 0 | 0 | 0 |
| 99211 | 0 | 0 | 0 |
| 99212 | 25 | 24 | 861 |
| 99213 | 245 | 148 | 13,421 |
| 99214 | 1,152 | 649 | 94,934 |
| 99215 | 0 | 0 | 0 |
| Total | 1,635 | | $ 135,450 |

118.   Of Dr. Lagattuta's 1,635 E/M Medicare part B claims in 2016, 1,365 (83%) were for CPT codes 99204 and 99214 (213+1,152). These codes involve a presenting problem of "moderate to high severity" and are described as having typical face-to-face time with

the patient of 45 minutes (99204) and 25 minutes (99214). However, a visit's duration is an "ancillary factor and does not control the level of service to be billed," Manual at § 30.6.1.

119.   When so few patients with purportedly "moderate to high severity" issues receive any treatment, it suggests that Dr. Lagattuta upcodes many CPT 99204 and 99214 evaluation and management claims.

## IV.   Causes of Actions

120.   This is a claim for refunds, treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*., and California Government Code §§ 12650 *et seq*.

### A.   Count I: Violations of 31 U.S.C. § 3729(a)(1)(A)

Relator repeats and realleges the paragraphs above as if fully set forth herein.

121.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to Government Health Care Programs, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

122.   The United States paid said claims and has sustained damages because of these acts by Defendants.

### B.   Count II: Violations of 31 U.S.C. § 3729(a)(1)(B)

Relator repeats and realleges the paragraphs above as if fully set forth herein.

123.   Defendants knowingly made, used or caused to be made, or used false records or statements material to a false or fraudulent claim, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

124.   The United States paid said claims and has sustained damages because of these acts by Defendants.

## C.   Count III: California False Claims Act Violations

Plaintiff repeats and realleges the paragraphs above as if fully set forth herein.

125.   Defendants knowingly presented false and fraudulent claims for payment or approval to the State of California, and the payment of the false or fraudulent claims was a reasonable and foreseeable consequence of Defendants' statements and actions. Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false. Cal. Govt. Code § 12651(a)(1)).

126.   Defendants knowingly made, used, and caused to be made or used, false records or statements — i.e., the false certifications and representations made by Defendants when initially submitting the false claims for payments and the false certifications made by Defendants in submitting its cost reports — to get false or  fraudulent claims paid and approved by the State of California. Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of Defendants' statements and actions. Cal. Govt. Code § 12651(a)(2).

127.   Defendants knowingly and improperly avoided their long-standing and continuing obligation to repay the wrongfully received and retained Medi-Cal funds to the State of California, in violation of the California False Claims Act, Cal. Govt. Code § 12651(a)(7).

128.   The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

129.   By reason of Defendants' acts, the State of California has paid money to Defendants upon the false, fictitious, or fraudulent claims described in this complaint and has thereby suffered damages. been damaged, and continues to be damaged, in substantial amount to be determined at trial.

130.   Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

### D.    Count IV California Insurance Frauds Prevention Act

Relator repeats and realleges each and every allegation contained in paragraphs above as though fully set forth herein.

131.   This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7, as amended (referred to in this Count as "the Act"). The Act provides for civil recoveries against persons who violate the provisions of the Act or the provisions of California Penal Code sections 549 or 550, including recovery of up to three times the amount of any fraudulent insurance claims, and fines of between $5,000 and $10,000 for each such claim. Cal. Ins. Code §1871.7(b).

31 Complaint

1  132.  By virtue of the acts described in this Complaint, Defendants knowingly presented

2  or caused to be presented, false or fraudulent claims for health care benefits, in violation

3
4  of Penal Code §550(a) and (b).

5  133.  Each claim for reimbursement that was inflated as a result of Defendants' illegal

6  practices represents a false or fraudulent record or statement, and a false or fraudulent

7  claim for payment.

8
9  134.  Private insurers, unaware of the falsity of the records, statements and claims made

10  or caused to be made by defendant, paid and continue to pay the claims that would not be

11  paid but for Defendants' unlawful conduct.

12  135.  The California State Government is entitled to receive three times the amount of

13
14  each claim for compensation submitted in violation of Cal. Ins. Code §1871.7.

15  Additionally, the Government is entitled to the maximum penalty of $10,000 for each and

16  every violation alleged herein.

17

18

19

20                                    ***PRAYER***

21       WHEREFORE, *Qui Tam* Plaintiff Relator Capeder, for the United States, the State

22  of California, and for himself, prays that judgment be entered against Defendants as

23
24  follows:

25       •       For each count, the amount of damages, trebled as required by law, and civil

26               penalties up to the maximum permitted by law,

27

28

                                    32 Complaint

1

2 • For the maximum *qui tam* percentage share allowed by law and for

3 attorney's fees, costs and reasonable expenses; and For any and all other

4 relief to which Plaintiff may be entitled.

5 Plaintiff requests trial by jury.

6 11/5/18

7 /s/ Phillip E. Benson
Phillip E. Benson  (CA 97420)

8 Warren - Benson Law Group
620 Newport Center Drive

9 Suite 1100

10 Newport Beach, CA 92660
Phone: 949-721-6636

11 philbenson@warrenbensonlaw.com

12 Jonathan Kroner (Fla. Bar 328677)

13 Law Office Jonathan Kroner
300 S. Biscayne Blvd., Suite 3710

14 Miami, Florida 33131
305 310 6046

15 jk@FloridaFalseClaim.com

16 *Pro hac vice admission to be applied for*

17 Attorneys for *Qui Tam* Plaintiff/Relator

18 Steven Capeder

19

20

21

22

23

24

25

26

27

28

33 Complaint